The next case the court is going to hear is Kelly versus O'Malley, appellate number 22-1688. Before we begin the time of the argument, the panel would have preferred to have both of you live in the courtroom with us, but with the ambiguity at the end of that last week, we were concerned about last minute changes and counsel incurring cancellation and the rescheduling costs, so we decided to remain remote with you today, we look forward to seeing both of you in person at the next argument. So with that in mind, we'll hear from the appellant. Noah Geary Thank you. Good morning. May it please the court. My name is Mr. Vashevik. My name is Noah Geary. I represent the appellants, the mother and sister of Bruce Kelly Jr., deceased. The mother and sister here are at my side in my office. I would like to reserve three minutes for rebuttal, please. That'll be granted. Thank you. The Kellys and I asked you to reverse the lower court's grant of summary judgment to the officers. The lower court found as a matter of law that the officers were entitled to qualified immunity. In so doing, however, the lower court improperly and egregiously violated the standard of review at summary judgment in a number of ways, and most remarkably, by removing from the factual scenario of this case the two undisputed yet unexplained gunshots to Kelly's back. Removing this material fact violated the standard of review at summary judgment. Of course, at summary judgment, the Kellys are to get all facts booked in their favor and the light most favorable to them and every reasonable inference. And at page 49 of its opinion, the lower court stated this in its entirety, in the entire case, in a 50-page opinion, quote, that two of the bullets entered through the back is immaterial when considering the rest of the record. Yet the lower court failed to identify what other facts in this record rendered the two unexplained shots to Kelly's back immaterial. A fact is material if it could affect the outcome of the case under the substantive law. The substantive law here is one of reasonableness. So a reasonable jury could conclude that the two shots to the back by O'Malley and Rivati while Kelly's fighting off the dog were unlawful force. So for a lower court to remove a fact, and this is it. So Mr. Geary, our standard of review is de novo on this legal question, is it not? Yes, it is. Okay, so why do we care what the lower court found? It's something we have to consider. It's something we have to consider. But the question here for us is whether or not there was a constitutional violation. And if there were, and was it a constitutional violation that had been clearly established? Your Honor, the lower court premised its addressing qualified immunity in the questions of law on determination of the facts that were erroneous. The lower court ruled there were only two material facts in this case. Movements toward the officers and distance. That is error. The lower court erred by ruling there were only two material facts here. And so ruling the lower court again removed the pivotal fact that Kelly was shot in the back twice. So the lower court construed the facts erroneously. What's the significance of that? Tell me the significance of that as to the decision of the police officers to fire on Kelly. Because this could be an obvious case. If a jury believes that these officers and the two shots to the back totally contradict O'Malley and Revati's version of the shooting. O'Malley's the primary shooter, seven shots. He said Kelly is walking towards O'Malley. He's facing O'Malley. And O'Malley standing in one position fired all of his shots from one position at Kelly who was facing him. And Kelly then fell backward onto his back. So the two shots to the back, neither officer could explain them. And it renders their version impossible. So the lower court here premised its addressing questions of qualifying immunity on a total misapprehension of the facts of record. And this would be an obvious case. And we don't even need to get into looking at other cases because under Russell versus Richardson and L versus city of Pittsburgh in a case in an extreme situation like this where deadly force is used, it can be considered and is an obvious case under Tennessee versus Garner and Graham versus O'Connor. So the lower court also made an error of law on this point because the lower court ruled no, no, no, no, no. Graham versus O'Connor and Tennessee versus Garner. They're too vague. They don't constitute clearly established law in an obvious case. That's not true. And that's contradicted by Russell versus Richardson and also L versus the city of Pittsburgh. Well, if you consider where Mr. Revati seems to describe his position as compared to Mr. Kelly, he also like O'Malley testified that they saw steps toward the officers. Why isn't that a sufficient explanation for why there were gunshot wounds to the back given Revati's position, observing that which Kelly described? Because Officer Hahn, an eyewitness officer, directly contradicted Revati and O'Malley's version. And there's no greater example of a genuine dispute of material fact than when eyewitnesses contradict each other. That's why we have juries. And Officer Hahn said. So your, so your, is it been your argument while the position of those two gunshot wounds were something that should have been considered? I gather what you're saying is there's a disputed issue of fact as to whether there was forward momentum in some way towards Officer O'Malley because O'Malley and Revati testified and, and I Hahn did not. Correct. And Granger, Granger didn't testify to a movement at all. Correct. Correct. And on the issue of waiver of Granger, now, obviously the rationale behind waiver is the bar on waiver is if the lower court did not, you know, depriving the lower court of addressing the issue, but the lower court of page 11 of its opinion did address Granger's testimony at page 11 of the opinion, but the lower court misapprehended Granger's testimony and said, well, Granger's testimony was consistent with O'Malley and Revati. And that's not true. That's not true. Counsel, before we, before we move into Granger, because I just want to make sure I understand where, where you see the shots that the officers fired as factoring into the I, my understanding is, is that Revati testified that he fired the two shots at Kelly's back, part of his back. Right. And, and Kelly, I don't, I don't believe Kelly has ever disputed that fact. So, so I'm just, can you help me understand how that sequence of both Kelly and O'Malley, excuse me, both Revati and O'Malley firing shots at Kelly, it creates a, creates a material issue of disputed fact here. Yeah. Thank you. But Kelly's have always disputed Revati's, Revati didn't shoot Kelly in the back from Revati describes where he was. He was to the left of O'Malley and he was, Kelly was facing Revati and a little bit of Kelly's side, his flank. So Revati's shots, a, a jury could determine Revati's shots weren't directly where the entrance wounds are the mid back of Kelly. Revati couldn't have made those shots. A jury could determine, nah, those weren't from Revati. Okay. And if you shoot on the reasonableness, how the two shots to the back weigh in directly on the reasonableness argument and the seizure analysis, the reasonableness, if a jury concludes that these two officers or one of them shot Kelly in the back as he's fending off the dog, that is unlawful force because fending off the dog does not mean Kelly has an intent to harm or kill either officer. So you can't shoot him in the back twice. Revati's own description was essentially on the flank. It is not a fair construction of Revati's testimony that he shot Kelly in the back twice. And he, he even said, Revati says, I don't know how he got shot in the back and so did O'Malley. Uh, in any event, separate from the two shots to the back, there are no movements towards the officer. There's a genuine dispute of material fact. And then where do you make that? So now that we're moving to the Granger, where, where have you, where did you make that fact before here? I understand you raised that now on appeal, but, but where did you raise this in your arguments below in the district court? This idea that the Granger Granger's testimony creates a material issue of fact, I did not raise it in the courts below in the court below. And I concede that. However, any waiver issue would be cured because the lower court of page 11 of its opinion addressed Ranger's testimony anyway. And you can read that at page 11. Also the cardinal caution in a deadly force case is that the lower court to prevent any unfair advantage of the officers because they kill the only witness who would contradict them. Kelly, the lower court under Abraham versus Rosso had a duty to examine the entire record, to look for any circumstantial evidence, which would tend to contradict a Malian revised account. So why did Granger? So, so I I'm with you. Why, why does, why does Granger's testimony contradict this movement? Thank you. He says when the dog was stabbed, shots were fired. So that means that directly contradicts a Malian Revati because a Malian Revati claim after Kelly stabs the dog and the dog goes up at him twice, the dog runs away and then Kelly turns around and starts walking toward O'Malley and Revati and Granger's eyewitness account negates that there's no turning toward O'Malley and Revati. There's no steps toward them. He what I'm sorry. I guess that I guess the point of a judge made his question. What is it that contradicts what O'Malley and Revati have said? There's a gap in Granger's testimony. You could have asked that question. You created a gap here by not asking that question in deposition. But so the question for us is, is that a contradiction? Why, why your honor? Why is, why is there a gap? Granger said when the dog was stabbed, shots are fired. So he's fighting off the dog. So he's fully occupied with the dog. So even if Kelly made some movements toward O'Malley and Revati, he's doing so while fully occupied with the dog and O'Malley and Revati see that. So they know his movements aren't deliberate conscious movements. He's coming towards them to harm them. He could, his body could be moving toward them as he's fighting off the dog. We can't read into the record a gap by Granger. Granger said there was no gap. He said when the dog was stabbed, shots were fired. But you didn't ask him, you didn't ask him, did he make any movement before the shots were fired? Well, Mr. Ivashevic didn't ask him that either, I guess. I mean, Granger, I asked him hundreds of questions. And Officer Hawn also says, I heard the gunfire and I saw the guy with, the bad guy with the dog in the air. So the dog is up in the air and Kelly is fighting with the dog when he shot. That contradicts O'Malley and Revati because O'Malley and Revati claim Kelly is done fighting with the dog. He's done fighting with the dog. And then he turns toward the two officers and starts making movements towards them and starts walking toward them. So it is a contradiction because Granger and Hawn clearly describe Kelly is still fully with the dog. O'Malley and Revati say, no, that was over. It was clearly over the dog and run away. And now he turns to us in a threatening manner and starts walking toward us. Let's turn if we could to what was the right? Do you agree that the district court articulated it correctly? If it did not, what is the clearly established right on January 31, 2016 to which Mr. Kelly was entitled? Thank you. My position is that the lower court erred and misdefined the constitutional right issue here and did that in a number of ways that contained error. Number one, the lower court removed from the definition, the inherent and all important fact in this case that Kelly shot in the back twice. We cannot just take facts and put them over on the side and say, we're just going to her definition. The lower court's definition did not include the two shots to the back. The definition also included a disputed fact as to movements toward the officers. Another disputed fact contained in the lower court's definition is the distance. Oh, it was eight feet away. So when the right is misdefined, we can't come to the correct answer when it's misdefined. So again, my question is, what is the definition that you think we should be applying? I understand your argument as to what was problematic about aspects of the district courts. What is the definition? It is the right to be free from deadly force when when your back is to the officers and you're fending off defensively an attack dog and under Graham versus O'Connor and Tennessee versus Garner. Again, those have been deemed to constitute clearly established constitutional constitutional law in the obvious case. So this is an obvious case under Richard Russell versus Richardson and L versus city of Pittsburgh. This is an obvious case. The lower court said that the Kelly's definition was overly broad and the lower court committed an error of when the lower court stated Garner versus Tennessee and Graham versus O'Connor do not constitute clearly established law in an obvious case. But you just you just criticized the district court for not including the two shots. Yeah. And assuming there was a step forward, your definition commits the same error from your adversary's point of view. I imagine that that the officers that the officers were facing the back of Mr. Kelly. So so isn't your isn't your definition problematic, too, because it assumes a disputed fact of my ultimate position in this case is that there are you can't create a definition of a clearly constitutional right when there are disputed facts and when there are inherent credibility determinations to be made. So here, how do you tell me how the jury instructions are going to go at trial? The jury has to be told an individual has a right to be free from fill in the blank. Otherwise, they won't know whether they're what constitutional protection they're evaluating. So there has to be some definition, right? Sure. On the verdict slip, there would be jury interrogatories on factual questions. Do you believe the officer shot Bruce Kelly in the back while he was fending himself off with the dog? Yes or no. And if it's yes, it's this. If it's no, it's this. So there will be factual questions that also lead then to the legal issues of qualified immunity. So here, this factual scenario is so inherent disputes of material fact, credibility determinations. No one is a matter of law can decide this. And so that's why the proper remedy is reversal jury trial with on the jury interrogatories on the verdict slip. The jury has to resolve these factual questions after making credibility determinations and then determine whether as a matter of law, the officers are entitled to qualified immunity. You and you have asked us, I think, appropriately to focus on the events immediately surrounding this shooting. What do we make of the 20 minutes that proceed with the less lethal uses of force to try to cause him to drop the knife, et cetera? What do we make of those facts? Are they relevant in a deadly force case or are the only facts relevant or those that immediately proceed the use of force, the seizure, shall we say? No, the court has to look at all of the facts, the totality of the circumstances, including the facts that led up to the use of deadly force. Two things you need to consider, please. Number one, Bruce Kelly is in a gazebo open container violation at most. If he walks away from the officers and they're going to arrest him for a summary offense, which they're not allowed to arrest for a summary offense, you have to give a citation. So there's no felony involved in this case. Bruce Kelly walks for 18 minutes. Yes, he should have put the knife down. However, all he did was walk away from the officers and not drop the knife. And the second point is, so no reasonable officer would conclude, well, this guy's dangerous and I'm in fear for my life when he just walks away and won't put the knife down. Secondly, Officer O'Malley testified in prior deployments of the canine by O'Malley in live scenarios, mere presence of the German shepherd caused the suspect to drop the knife and surrender. Here, O'Malley hid behind the bushes with the German shepherd, contrary to his own training and his own practice. Kelly never saw the dog. O'Malley hid the dog. So the deployment of the canine on Kelly was unreasonable by O'Malley. O'Malley denied Kelly the opportunity to look the 124 pound German shepherd. And had he done that and Kelly saw the dog, Kelly might have thought, well, that's a gigantic German shepherd snarling at me and then dropped the knife. So is there a fact though, doesn't, doesn't Officer O'Malley testify that he warned Mr. Kelly and Mr. Kelly made a comment about the violence he would show towards the dog if he's, if the dog came in his direction? I mean, aren't there, isn't there a dispute? You're saying that your position is that Mr. Kelly was backwards constantly to the officers, but the officers testified he faced them and Mr. O'Malley discusses what he used to try to warn Mr. Kelly from his point of view before the dog was released. There are disputes of fact as to the deployment of the dog. To specifically answer your question, other officers said to Kelly, Kelly's walking away from all of them. And he's quite a distance from O'Malley. And there are no civilians where Kelly's walking. There's no harm to anybody. And other officers say to Kelly, Hey, we're going to get this dog. We're going to sick this dog. And Kelly says, I'll kill that dog. Now at that moment, Kelly doesn't see. And O'Malley even said, he goes, I didn't think Kelly saw me behind the bushes. My impression was he didn't see me or the dog. So when, when O'Malley comes out behind the bushes and give Kelly warning, officer Kapinas specifically testified that himself Kapinas and other officers are yelling at Kelly. So Kelly has multiple officers yelling at him, put the knife down, do this, do that. When O'Malley gives the two warnings to Kelly. So we don't know that Kelly even heard the warnings by O'Malley. We have to look at this and give the Kellys the benefit of every fair inference. So Kelly never saw the dog. And we don't know that Kelly even heard the warning by O'Malley. And then O'Malley releases the dog and he bites the back left shoulder. Okay. Let me see my question. Thank you. Thank you, Judge Schwartz. Just one final question. Counsel, am I understanding your argument on the clearly established law that this is a case of obviousness and therefore you don't need to point to a specific case that would have given the notice in 2016. Is that your argument? Correct. It's an obvious case, but the cases that stand for the principle and make this an obvious case are Tennessee versus Garner and Graham versus O'Connor and Russell versus Richardson and L versus city of Pittsburgh state that they state that those two seminal cases from the U.S. Supreme court constitutes clearly established law in an obvious case. So yes. So then you're so right now I follow you. And so your argument is that Russell, where there was a minor who was relaxing undressed unarmed when the police came and shot that's that clearly establishes the law for the facts and circumstances of the officers encounter with Kelly. Yes. And then my alternative argument obviousness is even a novel situations under qualified immunity jurisprudence, even in a novel situation, officers can be fairly on notice that the use of deadly force is unreasonable. Okay. Judge Fisher, do you have any further questions for counsel? Mr. Geary, there appear to be, and some of them are cited, some of them aren't, but there appear to be a substantial number of cases from the circuits. Uh, unfortunately, none from the third circuit, the substantial number of cases in the circuits on whether or not the use of deadly force on a knife wielding suspect, who's not moving towards the officers in a threatening manner, whether or not that's a violation, uh, four circuits have said, uh, it is not. And others, I think three circuits have said that it is. So, uh, I don't know if you're familiar with all those cases, but if you accept what I just stated is being close to accurate, uh, doesn't that show that there is not a consensus on whether or not the law is clearly established and what you do with a, uh, a knife wielding suspect who's not moving towards the officers that would be giving your argument, the benefit of the doubt that Kelly did not. I'm sorry, your honor. Uh, you kind of, I'm sorry. You kind of froze there. Uh, the last bit of, I think your final sentence, I didn't catch it cause you were frozen on the technology. I'm sorry. Okay. Sorry about that. Uh, it's probably the case that I had to go, my voice had to go to Philadelphia and back and it got stopped somewhere in between. But my question was, doesn't the split of decisions on this question, uh, support the position that there's not a consensus that this right has been clearly established. Well, the consensus analysis only comes into play. If this is not an obvious case, number two, uh, Kelly, I guess, I guess that would be my point. Lacking a consensus on this more specific question. Doesn't that make it a non obvious case? No, if it's a, no, respectfully, if it's an obvious case, you don't need to get into whether or not there's a consensus. Even when they get into whether or not there's a consensus, Kelly facts, they have to be analyzed in such a way to compare the facts. Are the Kelly facts sufficiently analogous to the other cases here? It is improper and we cannot reach what the facts are in the Kelly case because there are genuine disputes of material fact and credibility determinations inherent in the analysis. So it would be an error of law for us to define Kelly to then compare it to other cases and say, well, is it sufficiently analogous because we're invading the province of the jury here? Okay. Thank you, Mr. Jury. Thank you, Mr. Gary. We'll have you back on rebuttal. Thank you. You bet. We're here for counsel for the appellees. Yes. Thank you, your honors. And good morning. My name is Greg of Ashwick. I represent the defendant, Appley police officers, Brian O'Malley and Dominic Cavati. We respectfully submit that the district court in this case did find the facts correctly and did apply the law correctly in granting summary judgment in favor of both defendant officers based on the second prong of qualified immunity. The district court determined the plaintiff's fourth amendment right at issue was not clearly established at the time of the officer's alleged misconduct, which is the controlling date, January 31, 2016. As we counsel her definition of the court, the district court's definition of the right included within it that the officers observed the individual stepping forward. Would you agree that the record is disputed? Will we have O'Malley, Cavati, and Mr. Hickness, forgive the mispronunciation, observing a step forward, Mr. Granger testifying about no step, but rather simply attack of the dog shots fired and Mr. Hahn testifying that the dog was in the air when shots were fired. Doesn't that alone create a disputed issue of fact that makes her her statement of the clearly established law presuming such that she couldn't decide at that on summary judgment? First of all, Judge, I might disagree somewhat with your characterization of testimony of Officer Coppiness and Officer Horn. I'd be happy to review that, but no, it does not. Nothing in the record which was evaluated so thoroughly by the district court in this case shows any contradiction or conflict of the movement. Yes, Mr. Geary has argued that a couple of officers during their testimony, questions which he failed to ask for whatever reason he chose, did not say that Kelly made a forward movement towards Officer O'Malley. But that's not a contradiction. That does not create a genuine issue of material fact. There is not one scintilla of evidence in the record from any witness or any document that says that Kelly at no time made a forward movement towards O'Malley. And irrespective of that, Judge, I might say, and Judge Fischer was talking about the consensus of other courts of appeals, but I would refer back to the Supreme Court case of Casella v. Hughes. We know in that case that a suspect had a sword. We're not dealing with the gun. And the officers arrived on the scene and there was a bystander approximately six to eight feet away, same distance that we had in this case. In that case, the suspect made no forward movements towards the bystander who was the individual in danger. And yet the Supreme Court did apply and grant qualified immunity to the officer in that case. So I think that controls, regardless of what the court would determine, whether or not there were movements, there don't need to be movements based on Casella v. Hughes. But circling back to movements, the district court thoroughly reviewed the evidence in this case. And I think without doubt, there's nothing in the record to contradict the testimony in the evidence that there was some forward movement towards O'Malley. However it's described, spinning, moving towards, steps, and it was described differently by different witnesses. But all consistently, no witness said that did not happen. That is what I submit that the plaintiffs need in this case to show a genuine issue of material fact. And we don't have that in this case. And remember, this is the time that occurred and elapsed from the time the K-9 was released until the defendant, Appleese, shot Kelly was 10 seconds. There's no challenge to that by the plaintiffs in this case, and there's nothing in the record to challenge. So this, as the Supreme Court has pointed out, is the precise case. We have a very fast, tense, fluid, rapidly evolving circumstance where these officers are faced with a man, a large man, who has resisted arrest and refused dozens of commands to drop his knife. And the pre-knowledge of the defendant officers in this case is very important because their pre-knowledge, and this is addressed in all the precedent that I've cited in my cases, and particularly, again, in the case of James v. New Jersey State Police, and also Berkeland v. Jorgensen, it's important to know what did the officers know before the ultimate encounter where they discharged their weapons. And in this case, both officers knew and had reasonable belief that Kelly posed a threat. And in this 10-second period, the canine is released, and we know, without dispute, no challenge by the plaintiffs, this man, Kelly, stabbed viciously, police canine Aaron, in the head, in the face, in the neck, and he's spinning as he's doing it. He's turning, and then he's turning towards the direction of O'Malley. But you agree, like, I understand about the issue about the dog and the attack on the dog, but we have, unfortunately, throughout the case, that the stabbing of the dog alone is not enough to pose a threat that would allow deadly force. I mean, that seems to be what our colleagues from the earlier panel said. So, I'm not sure what we're supposed to do with that from your point of view, and we've already been told the stabbing alone is not enough. So, don't we have to see something more? Don't we have to have undisputed facts of a step forward at the time of the use of deadly force? Well, again, Judge, based on the Supreme Court case of Casella versus Hughes, I don't think we need evidence of a step forward because it didn't exist in those facts in that Supreme Court case when they granted qualified immunity. But I'm certainly not conceding that there weren't steps forward. And yes, I understand when this case was up the first time following the motion to dismiss, the court indicated, I believe it was in a footnote, that the stabbing of a police canine, in and of itself, does not constitute a basis as a matter of law to deploy deadly force. That's not the reason. It's what happened in the time after he completed the actions of stabbing the police canine, when he made his move towards O'Malley from only eight feet away with the bloody knife in his hand. Without question, I don't see how any reasonable juror or respectfully a court could review and find that a reasonable officer under an objective review in that circumstance would not be in fear of his life or in fear, at least, of serious physical harm. And that's the standard we're evaluating. Can I ask you to respond to your officer? Judge, may you go ahead? No, no. I was just going to say, Kathleen, you said it was in the events after the canine was multiple tasing, the pepper spray, the attempt to disarm the knife, which led to an assault, the repeated commands to disengage and drop the knife. I mean, I would assume all of that has to factor into the reasonableness, too. Absolutely, Judge. And I think that's an excellent question. I point that out in my brief and the district court discusses all that. And that's the knowledge that the officers had leading up to this. And I would submit this was a textbook pursuit. Mr. Kelly never stopped moving the entire time. They exhausted every means available of nonlethal force. In fact, in the parking lot, which the court has the video of before the shooting, maybe five minutes before the shooting, when Officer Sanders from the Port Authority attempted to sneak up behind Mr. Kelly with a baton and hit him in the right hand and knocked the knife free. It's clear on video. It's undisputed. He whipped around with the knife, pointed right at Officer Sanders. I would submit it's not an issue in the case. That sequence right there, that occurrence justified the use of deadly force. But they didn't look at the screen. Counselor, are you saying that if there were no step forward and his back was to him and he was swinging around with the dog, the events that Judge Mady just described would have justified the use of deadly force? Well, if his back... Because I've watched the video, so I know exactly what you're talking about. I've seen the pace he was moving at. I saw the officer's efforts. So I'm aware, as I'm sure my colleagues are, of what you're describing. But if we assume that there was no need for a step forward, deadly force was justified by the lack of effectiveness of nonlethal alternatives and the stabbing of the dog. You're telling us that would justify deadly force? Well, Mr. Kelly demonstrated his willingness to resort to violence. He demonstrated for them that he was a serious threat. He refused dozens of commands to drop that knife. He whipped around and pointed at Officer Sanders in the parking lot, as we all saw on the video, his stabbing of the police dog. The officers were confronted with the man that would not comply. Okay. Could they have shot Mr. Kelly when he pointed the knife at Officer Sanders? Well, that's not... I believe so. Yes, Your Honor. I believe there was justifiable use of deadly force in that circumstance. Again, from the perspective of a reasonable officer objectively reviewing, at that moment, could the court determine that Officer Sanders and serious risk of physical harm from Mr. Kelly, when he made that action, whipped around and pointed it right at him in close proximity? I think under all the precedent that I've read, that action would have justified the use of deadly force. But they didn't. They restrained. They continued with further attempts at tasers, further attempts at pepper spray, in everything they could do to try to get this man under control, to apprehend him and get the man out of jail. Mr. Geary, a lot of the analysis in the briefs talked about the disputed facts being the distance that Kelly was from O'Malley and whether he was moving towards O'Malley. Mr. Geary, I thought, made a persuasive argument that there was a third set of facts here, and that is the significance of the shots in the back, and as to the credibility of whether or not Kelly was moving forward. Is that accurate? And does that, in part, constitute genuine issues of disputed facts, which would preclude summary judgment? Judge, I absolutely do not think it does. I think his argument has no merit. First of all, as the panel has questioned Mr. Geary, and obviously is very familiar with the record, the shots to the back were explained by Officer Rivati's position compared to Officer O'Malley. Officer O'Malley came across the street, and it was testified to by Rivati that O'Malley was at a 45-degree angle, and as the court has reviewed its questions to Mr. Geary, Officer Rivati's testimony said at the time he moved forward and took steps, which he testified to two days after the incident with the County Homicide Department, and then consistently at his deposition, he said, I was facing his side, part of his back, his center mass, and that's fired my two shots at center mass. So it clearly explains in the record why he may have been shot in the back. And even beyond that, I'm not aware of any case law that I've read, and I don't think this is applicable to our facts, that says that an officer may not deploy deadly force and shoot someone in the back if they meet the standard of posing at that moment a serious threat of physical harm or death to anyone, whether it's an officer or another person. I think what, as I understood Mr. Geary's argument to be, is he was using the shots in the back to dispute whether or not Kelly was moving towards O'Malley. And so the question is whether or not that's a disputed fact that contradicts the argument that Rivati makes that my shots, because I was at a 45 degree angle, were the shots that went into his back. And it's to me like a dispute of sorts. Is it a genuine issue of material fact under Rule 56 is the decision we have to make. Respectfully, I believe it is purely argument by Mr. Geary. It's not supporting the record. What this court would have to find is that Mr. Kelly was attempting to flee, run away from the officers. I mean, for this to be an obvious case like Garner or Tennessee, he would have had to drop the weapon and be running away. And if the defendant shot him in the back, there's no question that would be an obvious case. This clearly is not. And I think the district court very correctly defined the right at issue by reviewing all of the facts, determining what facts were material in defining Mr. Kelly's right at the time of the shooting, and then calling through the entire record to look for any contradictions, any disputes, which would create a genuine issue of material fact. And I think her citations to the record was excellent in explaining how she arrived at the definition, including the facts of Mr. Kelly's right on January 31, 2016, and explaining why they were undisputed and why there was no contradiction in the record. And if we look carefully at the movement towards Officer O'Malley, nowhere does it say or dispute that he was on eight feet away with uplifted knife in hand. It just doesn't. It's not in there. And if I had plenty of time, counsel, did you mean Granger? Because Copernicus, I think said there was a step forward. Yes, Paul. Yes. Yes. Granger and Han. In fact, I do have something handy in terms of Granger. Yeah. When questioned, Officer Granger testified. Everything was pretty much when the dog was stabbed, shots were fired. And I know that's what Mr. Gary's arguing about. But the very next question from Mr. Gary in the deposition, which is on page 66 of his principal brief, how much time elapsed? I know you're not thinking of it in that moment, but looking back in between the dog gets stabbed in the first shot is fired seconds. So there's clearly a break in that testimony from Officer Granger, although that's been waived, in my opinion, based on the case of USA versus Joseph. But that's another matter since we're discussing it. But there is a break. Mr. Kelly attempts to characterize now that the officers shot Mr. Kelly when he was in the midst of fighting the dog. And that was released for the first time as well. And I submitted in my brief that was also waived. But there's no evidence of that. A careful review of these questions of Officer Granger and Officer Hawn show that there is no genuine issue of material fact. There is no contradiction. There is no dispute. And again, I go back to the review of the record by the district court with appropriate citations to that testimony. Counsel, I'd like to go back just to a line that Judge Meadey was asking you about about the events that preceded the actual shooting. And in response to a question from Judge Fisher, you said that at the time that the officer who had the baton tried to use the baton and then you just were from your point of view, describe Mr. Keller's reaction with the knife. You're using your own description of what you saw. But that point in time, from your point of view, would have justified use of deadly force. As you said, officer showed restraint. Mr. Kelly continues his walk to the parking lot over the fence and ultimately down the street where the shooting occurred. Let's assume for the purpose of this discussion, all he did was not comply with the request to drop the knife. Would the fact that there was justification in the parking lot to use deadly force justify using deadly force once they got on to it? Well, that in itself, no, we're not, because the immediate threat would have ended once Kelly, I'm just saying, judging that moment of time when he whipped around that. I'm with you. I think we're talking about the same thing. Immediacy is the point. So it had, so although the officers had some knowledge, and I'm talking about Kelly and Ravati about certain things either because in the case of Ravati, he's present for some of it. In the case of Kelly, he heard some of the transmissions. It had to be, our focus needs to be on the immediacy of the events before the firearms are discharged. Not so much what happened in the parking lot to justify deadly force. Am I understanding you correctly? Absolutely. I just think that what the events that occurred before and the precedent shows, this is important to show what the officers knew because that's how we evaluate objective reasonableness, shows that they knew that Kelly was a threat, but that alone doesn't justify the use of deadly force. It ended the moment Kelly turned around from Sanders and walked away in the parking lot. The right to use deadly force was over. It did not, the right to use deadly force did not begin again until the 10 second sequence when the canine apprehension was attempted. The canine was stabbed and Kelly turned towards officer O'Malley from eight feet with a knife in hand, pointed at him and made some type of movement towards him. That is when the right to use deadly force was created for the second time, in my opinion. Isn't that eight feet? Isn't that distance, I'm not going to call it eight feet, isn't that distance question as to whether it was eight feet, 38 feet, 20 feet, isn't that somewhat in dispute? Isn't that a factor? Judge, in my opinion, I would submit it's not in dispute whatsoever. The only piece of evidence, and I have read this record inside now dozens of times, the only piece of evidence I'm aware of is a one page report that plaintiff's counsel submitted from an investigator. He sent out to take measurements from two points from near the stoop of the house in the yard where Kelly fell to the ground after he was shot, 710 Whitney Avenue, and then all the way across the street to the far end of the sidewalk. But there is no record evidence to support those measurement points. And this investigator simply took the information from Mr. Geary and said, okay, that was a 58 feet measurement, period. Didn't make any analysis of facts or anything. So Mr. Geary takes that measurement and attempts to argue that they were 58 feet apart. But there's no support in the record. There has to be record support for those measuring points. And I submit all of the evidence in the record supports the eight feet distance, the close proximity, whether it's eight feet, whatever you measure, it's close proximity. And even if it's somewhat more than eight feet, we look at the cases, it doesn't have to be eight feet is not a defined line where it has to be shorter. If it's longer, it's not. The question is from the perspective of a reasonable officer, objectively reviewing, did Kelly pose a threat of serious physical harm or death? And I think there could be no question based on the record, the uncontradicted review of the record that Kelly did. And it justified the deployment of deadly force in the shooting of Mr. Kelly by the defendant officers in this case. Thank you, counsel. Judge Fisher, do you have any further questions? I do not. Judge Mady. Just one, one more question counsel, so that I understand your explanation of what I understood to be the walking through of the Graham factors, you know, the totality of circumstances that the officers had to determine whether or not there was a serious threat of physical harm to them or to others, which looks to things like whether individuals resisting arrest, you know, whether or not there was a severe crime, whether there was immediate threat, all of that, I thought, does capture the events that led up to that 10 seconds that you're referring to after the canine was discharged. I certainly understand that at that moment, we're evaluating the immediate risk, but reasonableness of the officers objective perception that does that take into account that the 18 minutes that proceeded before and all of the events that led up to the discharge of canine? Absolutely, your honor. And I think the the case law that I reviewed the precedent in almost every instance talks about what the officers knew leading up to the shooting. It's officer that discharges his or her weapon and deploys deadly force. So what did they know? What was their perspective? So absolutely, all of this pursuit, the 16 minutes or 15 minutes, whatever it was that led up to this is important to consider and important to factor in. I agree. Thank you very much, counsel. Judge, maybe you have anything further? Nothing further. Thank you. Okay, great. All right. Thank you, counsel. Gary, while you're in rebuttal. Yes, thank you so much. Okay, first of all, even O'Malley himself never claimed that Kelly made steps or movements toward him until after he was sued. O'Malley was interviewed by the homicide investigators a couple days after this. That's page 43 of my brief. And here's O'Malley himself. And that's when I saw him. I mean, his arm was out. And he now he's spun toward us. And from where I was at, that's when I just I took my pistol out. And I just I just fired. That's O'Malley himself. Now he's spun towards us. That's it. Even O'Malley contradicts himself. And the spinning is probably because Kelly had a 124 pound dog literally on his body that's causing his body to move. So a jury is free to accept O'Malley's initial version of what happened. No steps or movements toward here or body versus O'Malley's later version. So even O'Malley inherently contradicts himself directly. And there's a genuine dispute of material fact just on O'Malley's different versions. Secondly, my colleagues stated, well, Officer Ravati did explain the shots to the back. No, he did not. On page five of my reply brief, it states that Ravati likewise offered no explanation question to the shots in the back question. Now, the autopsy report, it indicates that he was shot in the back twice. How would that have happened? Answer by Ravati. I cannot tell you that. So shooting someone at the flank in the side, the flank is the side of the body. The entrance wounds here are directly in the back as if someone is standing over Kelly when he's on the ground on his belly or they're directly behind. There's no way is it possible for Ravati from the side on the flank for the entrance wounds of his bullets unless they were magical to get directly into Kelly's back. So no, there is not an explanation by either officer as to the shots in the back. Casella versus Hughes had a hostage. There was a bystander and the concern was taking a hostage. There's no hostage in the scenario when O'Malley recklessly deploys the canine. Kelly is walking away from all officers. There are no officers around Kelly. There are no civilians. There are no children. The appellees here throughout the case. Kelly was a threat, a threat, a threat, a threat of what? In that moment when O'Malley releases the dog, the test is was Kelly a threat, a threat being a significant and immediate threat of death or serious bodily injury to the officers or a civilian. No one was in harm's way of anything, let alone being killed. Now let's please apply the deadly force factors which we've discussed a little bit here. Severity of the crime, active versus passive resistance by Kelly, ratio of officers to suspects. Here again, Bruce Kelly did not commit even allegedly any felony. He's not a fling felon. At the most resisting arrest, that's a misdemeanor, but yet it's an open container violation at the gazebo at most which is a summary offense. An officer can only, under the rules of criminal procedure, give him a citation. He also was carrying a dangerous weapon in the streets and didn't drop it, right? I can see that. Okay, that's fine. I can see that it's a misdemeanor. Then look at his resistance, active versus passive resistance. There's a distinction. What is active resistance? Resisting arrest actively means you are trying to punch the man, you're threatening them, you're trying to knee them, elbow them. Here, Kelly, at worst, all he did was engage in passive resistance. Well, you can't. You're making a good argument until he stabs a dog. Well, yeah, that's right there. You're making a good argument. You get to the scene of the shooting, he stabs the dog repeatedly, kills the dog with the slash to the neck. That's a police canine dog. All right, that's active resistance. Correct, but for 18 minutes, your honor, for 18 minutes after that, it's only passive resistance. And then O'Malley, all the 10 seconds, and O'Malley had to make this rapid decision, fast tense. I'm sorry, just to go back, what about the part where are you disputing the part where he spots away the baton when they attempt to disarm the knife? I'm sorry, I just, yeah, yeah, that's a couple, that he, something, the baton. Right, when the officers attempt to disarm him with the baton, that's not active resistance? That was, that was in that moment. And he says to Sanders, I concede it's active resistance. And he says to Officer Still, I concede it's active resistance. He didn't threaten to kill Sanders. He says, and he's hugging the gazebo. At the beginning, we need to remember, he's at the gazebo. He hugs the gazebo. Officers Hampton and Adams are dealing with his dad. Kelly hugs the gazebo. They start hitting his hands. He's allowed to hug the gazebo, which is passive, so passive. And that's why he pulls out the knife. But in any event, the Sanders interaction, yes, that was active resistance. Stabbing the dog was active resistance. However. Did pulling the knife out active resistance? Uh, no, I don't believe so. It's what he does with the knife. I mean, even so, you can't kill him for that. So even if that was active resistance, Your Honor, the other factor, okay, the severity of the crime, that goes to the Kellys. And the ratio of things, accepting everything you said, the things change once he attacks the dog. No, no, you're not allowed to use deadly force. The dog is not a human being. It's a tool. You can't kill someone, Kelly, because he stabs, you know, O'Malley's canine partner. So that is deadly force. Absolutely. Also, the ratio of officers to suspects here, a lot of these cases, it's one officer, one suspect, two officers, one suspect here. There are 22 officers who responded. It's 22 to one. So if you look at the factors under reasonableness and the deadly force analysis on balance, the majority of the factors go to the Kellys. So in my final point, please, Tolan versus cotton on whether lower courts should attempt to issues of qualified immunity. As a matter of law, summary judgment, Tolan versus cotton states the lower courts must take care not to define a case's context in a manner that imports genuinely disputed factual disputes. That's what the lower court did here. The lower court erred respectfully, and we asked you to reverse. And this case is entitled to a jury trial. The Kellys are entitled to a jury trial. Okay. Thank you very much, counsel. We thank both attorneys for their very helpful arguments and briefing. We'll take the matter under advisement, and we look forward to seeing both of you live and in Philadelphia or Pittsburgh at them in the not too distant future.